**Ronald BRADLEY, et al., Plaintiffs,**

v.

**William G. MILLIKEN, et al., Defendants.**

Civ. A. No. 35257.

United States District Court, E.D. Michigan, S.D.

April 24, 1984.

George T. Roumell, Jr., Thomas M.J. Hathaway, Riley & Roumell, Detroit, Mich., Gerald Young, Paul J. Zimmer, Jr., Asst. Attys. Gen., State of Michigan, Lansing, Mich., for School Bd.

Theodore Sachs, Detroit, Mich., for Union.

William Waterman, Pontiac, Mich., for LULAC.

Thomas I. Atkins, Gen. Counsel, N.A.A.C.P., Brooklyn, N.Y., Duane Elston, Detroit, Mich., Paul R. Dimond, O'Brien, Moran & Stein, Ann Arbor, Mich., for N.A.A.C.P.

Before FEIKENS, Chief Judge, and CHURCHILL and COHN, District Judges.

MEMORANDUM OPINION
AND ORDER

FEIKENS, Chief Judge.

On April 13, 1983 we ordered a hearing on the future of the Court's Monitoring Commission and the manner of assuring compliance with orders in this case relating to the educational components.

The order was prompted by our concern over the environment in which the Monitor-

ing Commission appeared to be operating. We are of the opinion that implementation of the educational components of the remedial orders should be an integral part of the responsibilities of the Detroit Board of Education and viewed by it in the same manner as its other responsibilities. We are of the opinion that our oversight responsibilities under the remedial orders and the manner in which courts usually operate to enforce such orders might distort the political processes which govern elected boards of education in Michigan.

Before further addressing this concern, there are several matters that require attention. Following written responses from the parties to the order of April 13, 1983, we delayed the hearing so that we could receive and review the reports of the Detroit Board on its implementation of the educational components as required by our order of August 28, 1981 approving the stipulation of the parties regarding the continuation and eventual phasing out of the educational components. This order envisioned a process of reporting, analysis, recommendations and implementation.

On June 1, 1983 the Detroit Board filed its final report on the inservice training and the testing components, which it supplemented on August 22, 1983. The State Superintendent of Public Instruction filed an analysis of the Detroit Board's report on July 1, 1983. The State Superintendent, after receiving additional information from the Detroit Board, filed a final analysis on November 15, 1983. We conclude that the Detroit Board has completed its obligations as to these components and has no further responsibility with regard to them.

On July 1, 1983 the Detroit Board filed its report as to the reading, guidance and counseling, bilingual education, vocational education, uniform student code of conduct, and school-community relations components. The State Superintendent filed his analysis on August 1, 1983. The Detroit Board filed a supplemental report as to the student code of conduct on August 19, 1983. On September 19, 1983, because of the inadequacies of the Detroit Board's report, we informally directed a further report and further analysis. A supplemental report was filed by the Detroit Board on November 1, 1983, and the State Superintendent supplemented his initial analysis on November 15, 1983. During this period two events occurred which sharpened the concerns which had prompted our order of April 13, 1983.

Within three weeks following the Detroit Board's July 1, 1983 report, the Monitoring Commission issued a response to the report sharply critical of the Detroit Board's performance as to the student code of conduct. The Detroit Federation of Teachers thereafter moved to cite the Detroit Board for contempt for its failure to properly implement the student code of conduct, relying on the response of the Monitoring Commission as the basis for its motion and proof of noncompliance by the Detroit Board. The Detroit Board answered the motion by taking exception to the Monitoring Commission's review and the Monitoring Commission responded with equal vigor to the Detroit Board's answer. Our follow-up to these filings disclosed that the student code of conduct had been promulgated directly by a court order, that the Detroit Board has never formally adopted the student code of conduct, and that any changes in the text of the student code of conduct require our approval. Additionally our review of the laws of Michigan relating to the authority of the State Board of Education, the State Superintendent and the Detroit Board tells us that there is ample legal authority for placing complete responsibility for assuring discipline in the Detroit schools, which is the goal of the student code of conduct, in these statutorily constituted agencies without the need of court supervision.

We neither condone nor condemn the Detroit Board's performance in this important area of school administration. Clearly there are shortcomings. However, the problems of student discipline are not unique to the Detroit school system. The recent report of a citizens' commission on violence in the Boston public schools and the President's concerns about the problem indicate the widespread nature of the problem.

Accordingly we are bringing to an end the requirement that our student code of conduct be part of the remedy in this case. We will provide ample lead time for the Detroit Board to adopt a student code of conduct. We direct the Detroit Board's attention to the recommendations of the State Superintendent in his November 15, 1983 analysis on the appropriate manner of doing so.

Second, on August 11, 1983 the Detroit Board filed a motion to allow changes in the school-community relations program now in place. The Detroit Board noted that a recent amendment in Michigan law requires such a program. The Monitoring Commission and the parties responded that the present program complied with the new law and there was no need to relieve the Detroit Board of the obligation to maintain this component. More important, it appeared to us that state law provides ample authority for assuring a proper school-community relations program in the Detroit school system and that there is no present need for a court-ordered school-community relations program.

Accordingly we are bringing to an end the requirement of our school-community relations program as part of the remedy in this case. We will provide ample lead time for the Detroit Board to put in place a school-community relations program. We urge the Detroit Board to use the good offices of the State Superintendent in designing such a program, particularly to assure that it is not dominated by the Detroit Board.

This brings us to the future of the Monitoring Commission. The environment we mentioned earlier is an inevitable result of the creation of the Monitoring Commission as an arm of the Court to report on the implementation of the educational components. In reporting to us it has been appropriate for the Monitoring Commission in fulfilling its mandate to make recommendations suggesting changes in the way the Detroit Board operates the Detroit school system. These suggested changes have been resisted from time to time by the Detroit Board. Certainly there could have been no expectation that the Detroit Board would always agree with the Monitoring Commission. The Detroit Board is elected by the voters of Detroit. Its responsibilities are defined by law. Under the laws of Michigan, the State Board of Education and State Superintendent have ample oversight authority. We believe that under present conditions the Monitoring Commission intrudes on the normal processes we mentioned above. This intrusion, however necessary in the past, is no longer necessary today.

The Monitoring Commission and its staff have provided a valuable service to us and to the community since its inception. Rather, with termination of the student code of conduct and the school-community relations components, there is no longer any reason for us to maintain a Monitoring Commission as an arm of the Court. We suggest that since the State Superintendent will have increased responsibilities with regard to the Detroit school system, it would be helpful to him if the staff of the Monitoring Commission became part of his staff and its budget was included as an increased appropriation for his department. Accordingly we are bringing to an end the requirement of a Monitoring Commission as part of the remedy in this case. We will provide for ample lead time for winding up the work of the Monitoring Commission and the issuance by it of a final report covering its creation, composition, operations, achievements and recommendations for the future.

In sum then:

1. The uniform student code of conduct requirement of the remedial judgment shall terminate upon the adoption of a uniform student code of conduct by the Detroit Board. The Detroit Board shall complete the adoption process by December 31, 1984.

2. The school-community relations requirement of the remedial judgment shall terminate upon the adoption of a school-community relations program by the Detroit Board. The Detroit Board shall complete the adoption process by December 31, 1984.

3. The Monitoring Commission shall terminate upon the adoption by the Detroit Board of a student code of conduct and school-community relations program as above described.

4. In the interim the Monitoring Commission shall continue its function and make recommendations to the Detroit Board with regard to an appropriate student code of conduct and school-community relations program and issue its final report.

We consider the pending motion of the Detroit Federation of Teachers moot.[*]

IT IS SO ORDERED.

[*] Our pending request to the State Superintendent to investigate matters raised by the Monitoring Commission regarding bus transportation is unaffected by this order. The responsibilities of the Detroit Board in this regard are independent of the educational components.